IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK SAMSUNG CELLULAR PHONE ATF ROANOKE CASE #768045-18-0051 ATF ITEM #0019, "DEVICE 1" CURRENTLY LOCATED IN THE ATF-ROANOKE EVIDENCE VAULT | Case No. 7:19mj132 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, William Engel, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21 of the United States Code.

3. I am a Task Force Officer with the Bureau of Alcohol, Tobacco, and Firearms and Explosives (ATF), and have been since October 2018. I have successfully completed the Bureau of Alcohol, Tobacco, Firearms and Explosives, Task Force Officer (TFO) training in the Washington, District of Columbia held at the Bureau of Alcohol, Tobacco, Firearms and Explosives Federal Headquarters. I have been employed in a law enforcement capacity since

1994 as a Police Officer; Police Detective; Police Detective Sergeant; Investigative and Patrol Lieutenant; law enforcement trainer and mentor in Afghanistan, employed by the Department of State and Department of Defense; and currently as a Task Force Officer. I have received training in various aspects of criminal law enforcement, including but not limited to criminal investigations involving arson, explosives, narcotics and firearms. Since becoming a TFO with ATF, I have provided sworn testimony before the Federal Grand Jury and in the United States District Court in reference to violations of the Federal firearms and narcotics laws.

4. The facts in this affidavit come from my personal observations, and my training and experience, as well as information obtained from other law enforcement officers and in interviews with witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1951, obstruction of any article or commodity in commerce, by robbery or extortion or attempts or conspiracies; Title 21, United States Code, Section 841, possession to intent to distribute a controlled substance; and of Title 18, United States Code, Section 924(c)(1), possession of a firearm in furtherance of a drug trafficking crime, have been committed.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched is a Black Samsung cellular phone ATF Roanoke case #768045-18-0051, ATF Item #0019, hereinafter "Device 1". Device 1 is currently located in the ATF Roanoke Evidence Vault, located at 310 first Street SW, Suite 500, Roanoke VA.

7. The applied-for warrant would authorize the forensic examination of Device 1 for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

1. In or about October 2018, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) opened an investigation into drug distribution and violent crime involving Aaron Lee WOODS and his associates. The ATF investigation was opened after a shooting incident on July 10, 2018, at 1642 Eastern Avenue, in Roanoke, Virginia, resulting in the death of Subject #1 (S#1).

2. On information and belief, WOODS and his associates have been responsible since 2017 for selling large quantities of marijuana in and around the Roanoke Valley. As set forth herein, 1642 Eastern Avenue, in Roanoke, Virginia, was a principal site of operation for WOODS and his associates from no later than the summer of 2017 until the late summer of 2018.

3. During the course of the investigation, agents encountered a source of information, SOI#1, who had personal knowledge of WOODS' distribution activities. SOI#1 met WOODS in the early part of 2017 through a mutual friend. According to SOI#1, WOODS was renting and living at 1642 Eastern Avenue in 2017. During the summer and fall of 2017, SOI#1 "hung out" or socialized with WOODS and others at the Eastern Avenue address.

4. During these visits, SOI#1 observed WOODS distributing large quantities of marijuana from the residence. SOI#1 described the Eastern Avenue address as a place where individuals would stream in and out on a routine basis throughout the afternoon and evenings in order to purchase quantities of marijuana from WOODS. As these transactions were occurring, SOI#1 and others would be "hanging out" at Eastern Avenue, playing video games and smoking

marijuana. SOI#1 stated that WOODS kept his marijuana at times in plain view on a coffee table in the front room of the residence. SOI#1 described the bags containing the marijuana as large, clear, vacuum-sealed plastic bags. During time spent at WOODS' Eastern Avenue residence, SOI#1 became friends with a WOODS associate identified by the initials, Roommate #1 (RM#1) SOI#1 stated that RM#1 was living with WOODS at that address.

5. RM#1 was shot at the Eastern Avenue residence on or about November 23, 2017, during an apparent home invasion. According to statements made by one of RM#1's parents after RM#1 was shot, and other circumstantial evidence, your affiant believes that RM#1 was alone at Eastern Avenue on November 23, 2017, at WOODS' direction, in order to protect the marijuana and cash at the residence. RM#1 was armed, as evidenced by his admissions as well as other evidence such as the analysis of the scene measuring the trajectory of shots fired within the residence. According to RM#1, at least two individuals attempted to enter the residence from the rear of the home while RM#1 was present. Two-way gunfire ensued, during which RM#1 was beaten and shot multiple times in the face and body. One of the intruders was killed, by RM#1, after RM#1 was able to gain access to a firearm. RM#1, it should be noted, stated that he was merely a short-term roommate and was not a "guard" although he did admit that not only was he aware of WOODS' marijuana distribution operation, RM#1 also assisted WOODS with this.

6. WOODS continued operating his marijuana business out of the Eastern Avenue address after the shooting of his associate RM#1. A source of information - SOI#2 – reported living with WOODS at the Eastern Avenue address between approximately April and July 2018. According to SOI#2, Co-Conspirator #1 (C#1) and Co-Conspirator #2 (C#2) were also living with WOODS at Eastern Avenue during this period and both of them assisted WOODS with his

4

marijuana business.

7. SOI#2 described the Eastern Avenue address as a something like a fast food operation for marijuana. On an average day in that residence, SOI#2 reported that between four and a dozen individuals, most between the ages of 18 and 25, would hang out at the residence between approximately 3:00 pm and 2:00 am, playing videogames and smoking marijuana in the living room. According to SOI#2, it was routine for WOODS and his associates – including at least two of his roommates, C#1 and C#2 – to carry firearms and to keep them in plain view, such as by leaning rifles against the wall, laying guns on furniture, or keeping firearms in their respective waistbands, while people were coming and going from the home.

8. SOI#2 stated that the stream of customers to the Eastern Avenue was constant. SOI#2 estimated that a dozen or more individuals would stop by Eastern Avenue to purchase marijuana on any given day. WOODS would often keep the marijuana in large, pound-size vacuum sealed bags on the coffee table as customers came in and out to purchase. In addition to WOODS, SOI#2 acknowledged that C#1, C#2, and SOI#2 would assist with marijuana sales by collecting money or by doling out the marijuana in quantities of anywhere from ½ gram to several ounces.[1] SOI#2 stated that the roommates kept their firearms at times in a large safe in the kitchen on the main floor of the residence, and that WOODS kept quantities of cash on his person or in a small safe in his room.[2] SOI#2 described WOODS as "flashing" his cash on occasion.

9. Two additional sources of information – SOI#3 and SOI#4 – provided statements

---

[1] SOI#2 was advised of his/her Miranda rights before speaking voluntarily with agents about this matter.

[2] On information and belief, neither SOI#2, C#1, C#2, nor WOODS has been convicted of a crime punishable by imprisonment for a term in excess of one year, commonly called a felony.

5

similar to that of SOI#2. In separate interviews, SOI#3 and SOI#4 described a frequent flow of marijuana customers through the Eastern Avenue address. SOI#3 and SOI#4 did not live at the Eastern Avenue address but spent several afternoons and evenings there each week. While there, SOI#3 and SOI#4 observed WOODS, C#1, and C#2 selling drugs to customers and they came and left from the home. SOI#3 and SOI#4 also observed WOODS, C#1, and C#2 in possession of firearms.

10. This distribution activity culminated in the death of S#1 on July 10, 2018. SOI#3 and SOI#4 were present in the residence at the time of the shooting. According to SOI#3, three individuals arrived in a single vehicle during the afternoon of July 10 for the purpose of acquiring marijuana. SOI#3 recognized the individuals as S#1 and two acquaintances. SOI#3 described a tense verbal exchange when the trio arrived, during which there appeared to be mistrust between the parties about the intended marijuana transaction. According to SOI#3, WOODS and C#1 communicated with the three customers, demanding to see the cash before handing over the drugs. S#1 and his/her two acquaintances in turn, demanded to see the drugs before handing over the cash. According to SOI#3, the transaction was unsuccessful, and the trio left without the marijuana for which they had come.

11. The trio came back later, at around 9:45 pm, according to SOI#3 and SOI#4.[3] Security footage from a nearby residence depicts S#1 vehicle arriving at Eastern Avenue, with headlights extinguished upon approach. According to SOI#3 and SOI#4 in separate interviews, a brick or other object then came into the living room through the front plate glass window. SOI#3 and SOI#4 stated that WOODS, C#1, and C#2 began shooting from the residence as individuals

---

[3] SOI#2 denied being present at the time of the shooting, which information was corroborated by SOI#3, SOI#4 and other circumstantial evidence.

associated with POI#1's vehicle returned fire. Based in part on his position in the vehicle and its direction of travel, S#1 was shot in the head and neck and killed as he/she attempted to drive away from the residence. From ballistics evidence, investigators were able to determine that some but not all of the firearms involved in the shooting have been recovered by police.

12. SOI#3 and SOI#4 stated that the two of them, along with WOODS and C#1, fled the Eastern Avenue residence after the shooting and drove to a location some distance from Roanoke. Over the next couple of hours or so, WOODS and C#1 discussed stories they would tell police about the incident. Based on the manner in which Eastern Avenue associates managed their firearms, as set forth herein, and C#2's admission during a recorded interview to his affinity for firearms in general, investigators believe it is possible that firearms associated with the shooting incidents on Eastern Avenue remain in the custody or control of WOODS, C#2, or their associates, concealed but not necessarily gone.

13. Three days after the shooting, on July 13, 2018, WOODS was arrested in Bedford County in a car belonging to SOI#1, in possession of approximately two pounds of marijuana. The marijuana was packaged in vacuum-sealed bags of the type SOI#2, SOI#3, and SOI#4 described seeing at Eastern Avenue. WOODS was charged in Bedford County with possession with the intent to distribute marijuana, a felony, which charge remains pending for trial on November 19, 2019 (Case Number CR19-000275).

14. WOODS was given a bond pending resolution of his Bedford charges.

15. Since his release on bond, WOODS has been living in the basement apartment at 1506 Compton Street, in Roanoke, with a family member and other individuals.

16. Since WOODS' release on bond, investigators in this case have received witness information suggesting that WOODS is continuing to sell marijuana from the basement

7

apartment on Compton Street, despite the death of S#1 and despite his currently pending felony drug charges in BEDFORD.

17. On June 1, 2019, an unrelated homicide investigation in Roanoke resulted in more witnesses discussing WOODS' continued involvement in the distribution of marijuana. One witness stated that he had been selling marijuana on behalf of WOODS and described WOODS' address on Compton Street as the location from which WOODS was operating. According to this witness, WOODS encouraged the witness and another friend to purchase and resell marijuana as a way of making money for Beach Week.

18. Another source of information, SOI#7, spent time with WOODS at the Compton Street apartment in June 2019. SOI#7 described a pattern of behavior by WOODS at the Compton Street apartment similar to what had been WOODS' practice on Eastern Avenue. According to SOI#7, WOODS had no source of income beyond marijuana sales. Between roughly mid-afternoon and the late evening, numerous individuals visited WOODS' Compton Street apartment to purchase marijuana. SOI#7 stated that he/she was present for many of these transactions and observed WOODS storing his marijuana in shoe boxes inside the apartment. Investigators have viewed, through SOI#7's social media accounts, videos taken in June 2019 that show WOODS engaged in marijuana transactions from within the Compton Street apartment, according to SOI#7, with C#1 and other individuals present as well.

19. Based on this and other information, ATF, along with the Roanoke City Police (RPD), conducted a surveillance and intelligence gathering operation at WOODS' Compton Street address. During the operation, which is ongoing, investigators have observed several individuals visit WOODS' basement apartment for short periods of time, consistent with drug transactions. Visitors to the residence enter and exit from a single door on the side of the

residence, which is the only point of ingress or egress from WOODS' basement apartment. Agents have observed WOODS emerge from and return to his apartment regularly during the surveillance operation.

20. On August 20, 2019, investigators observed WOODS as he walked from the residence and got into a silver Honda vehicle located approximately a block away from the apartment. He was in the vehicle for a brief time and then returned to his apartment, consistent with a hand-to-hand drug sale.

21. Shortly afterward, surveillance units observed a silver Ford Fusion arrive at the WOODS' basement apartment. The driver of the vehicle entered WOODS' residence and emerged a few minutes later. A female in the passenger seat of the Fusion remained outside, in the car, during the apartment exchange. Based on vehicle tags and the driver's distinctive physical characteristics, officers identified the driver as an individual subject to an active arrest warrant. They effected a traffic stop of the vehicle a distance later, in the area of Towers Mall and placed this individual under arrest. A K-9 was utilized to conduct a free air sniff and alerted positively on the vehicle. During a subsequent search of the vehicle, officers located and seized just under a pound of marijuana, packaged in a vacuum seal plastic bag and two mason jars. The substances later field tested with a positive result for marijuana.

22. Following an advisement of Miranda rights, the subject agreed to speak with officers. The subject identified WOODS by a photograph and admitted to purchasing the marijuana from WOODS a short while earlier, for $2,400. The subject, who admitted to purchasing regularly from WOODS over the past several weeks, stated that WOODS is obtaining marijuana from a source of supply in Washington D.C., which is consistent with information provided by SOI#7.

9

23. Agents have since made further observations consistent that Aaron Lee WOODS has moved from 1506 Compton Street, Roanoke, Virginia to 1445 Brooks Ave, Roanoke Virginia. WOODS was observed packing several personal items, to include boxes and bags and baby furniture on August 24th, 2019 and 25th, 2019, into vehicles WOODS and his girlfriend have been observed operating in the recent months, weeks and days during the surveillance operational times.

24. Agents had followed WOODS from the Compton Street area on August 30, 2019, to the 1445 Brooks Avenue residence, and on several occasions over the past 21 days, agents have noted WOODS' vehicle present at the residence at all times both day and night. Agents have also made observations of WOODS and his girlfriend come and go from this residence at different times during both the day and night and returning during hours which would suggest that they have currently moved into and are staying there as their abode. WOODS has also been seen leaving with another person as a passenger in a vehicle commonly seen at the residence and returning to the residence while WOODS vehicle has not been present.

25. Further observations made by agents at the 1445 Brooks Avenue, Roanoke, Virginia address are consistent with the same activities describes as above with vehicle traffic, which was observed at 1506 Compton Street. Notably, more than one of the vehicles seen at the Compton Street address suspected of purchasing narcotics have been seen making quick visits at the current address of 1445 Brooks Avenue, Roanoke, Virginia, and agents have observed WOODS outside the residence and his vehicle parked in the driveway of the residence as recently as Sept. 16th, 2019.

26. On Sept. 16, 2019, agents driving past the 1445 Brooks Avenue, Roanoke,

Virginia address noted a blue Nissan 370Z parked in front of the residence. As agents passed the vehicle they recognized WOODS seated in the passenger seat next to the driver with a significant amount of U.S. currency spread between them on the center console, conducting an apparent narcotics transaction. Agents followed the vehicle out of the area after WOODS departed from the vehicle and a traffic stop was conducted for an unrelated driving infraction. The driver appeared nervous and was visibly shaking. A K-9 was utilized to conduct a free air sniff and alerted positively on the vehicle. During a subsequent search of the vehicle, officers located and seized 6 grams of marijuana derived "High Country Sugar Wax", 8 grams of marijuana derived "High Country Infusions Shatter", 31.5 grams of hash oil and $865.00 U.S. currency. Additionally officers located $330.00 U.S. currency on driver's person.

27. On September 19, 2019, Agents executed a search warrant at 1445 Brooks Ave SE, the current residence of WOODS. Items collected included cellular phones, one of which was Device 1, narcotics, a firearm and U.S. currency located in WOODS' bedroom. The narcotics found in the residence were consistent with the narcotics law enforcement had previously obtained from the vehicle stop and search on September 16, 2019.

28. Following the execution of the search warrant, Agents interviewed WOODS at the residence location. Post-Miranda warnings, WOODS stated over the past year and recent months that he did sell marijuana and that communication for some of the sales were conducted through his phone and text messages, most recently, using Device 1. WOODS stated that he could order up to 20 pounds of marijuana from a source without creating a suspicion and arrange to meet to get the marijuana.

29. Agents located WOODS' phone, Device 1, identified as such by WOODS, which was passcode protected. WOODS unlocked Device 1 while in the presence of Agents and sent a

11



text to his source "zoobie" using an application on the phone named "Signal". While Agents supervised these actions by WOODS, Agents recognized multiple messages coming into Device 1 on Snapchat and other messaging applications.

30. During these observations WOODS' phone (Device 1) received a message from an individual named "Bun" via Snapchat. "Bun" is known to Agents as Joshua N. HUSKEY, a previous occupant at the 1642 Eastern Ave. NE, Roanoke, Virginia, residence.

31. Events described in this affidavit occurred within the Western District of Virginia.

## TECHNICAL TERMS

32. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media appurtenant to digital cameras can contain any digital data, including data unrelated to photographs or videos and photographs and other digital images downloaded from the Internet.

c. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet, including a wireless telephone, must be assigned an IP address so that Internet traffic sent from and directed to that computer or wireless telephone may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses which may be unique to a particular device or location, while other computers have dynamic—that is, frequently changing—IP addresses that may be assigned to a computer or

13

wireless telephone for short periods while such devices are being used in a particular geographic location or through a specific Internet service provider.

   d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and that the Devices are likely to contain other communications applications for each Device, including but not limited to social media and other communications applications such as Snapchat, Instagram, Twitter, What's App, Signal, Facebook, and Facebook Messenger. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, specific communications between users of the device and/or third parties, and data and other information downloaded to or accessed through the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when, in connection with criminal activity under investigation.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of each Device to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items and other evidence described in Attachment B.

## REQUEST FOR SEALING

40. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is

relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

ATF, TFO

William Engel
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn before me
on September 20, 2019:

UNITED STATES MAGISTRATE JUDGE
Robert S. Ballou